UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X   **Case No.**  5:22-cv-1050 (GTS/CFH)

SHERI RODRIGUEZ,

                              Plaintiff,                                    **COMPLAINT**

            - against -

EXCELLUS BLUECROSS BLUESHIELD, INC.,                                        **PLAINTIFF DEMANDS
                                                                           A TRIAL BY JURY**

                              Defendant.

------------------------------------------------------------------------X

SHERI RODRIGUEZ ("PLAINTIFF"), by and through her attorneys, PHILLIPS &

ASSOCIATES, PLLC and THE WASHINGTON LAW FIRM, PLLC against EXCELLUS

BLUECROSS BLUESHIELD, INC., ("DEFENDANT"), alleges upon knowledge as to herself

and her own actions and upon information and belief as to all other matters as follows:

## NATURE OF THE CASE

1. PLAINTIFF complains pursuant to the discrimination and retaliation provisions of (i) **Section 1981 of the Civil Rights Act of 1866,** 42 U.S.C. § 1981 ("Section 1981"); (ii) the **New York State Human Rights Law**, New York State Executive Law, § 296 *et seq.* ("NYSHRL"); and any other claim(s) that can be inferred from the facts set forth herein and seeks damages to redress the injuries PLAINTIFF suffered as a result of being discriminated against and retaliated against by DEFENDANT on the **basis of PLAINTIFF's race (African American).**

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. §12101, et seq., and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over PLAINTIFF's state and county claims pursuant to 28 U.S.C. § 1367.

4.  Venue is proper in this district in that the events or omissions giving rise to the claims occurred within the Northern District of New York. 28 U.S.C. § 1391(b).

## PARTIES

5.  At all times material, PLAINTIFF was and is an African American female, and a resident of New York State.

6.  At all times material, PLAINTIFF was and is a "person" and an "employee" of DEFENDANT and entitled to protection as defined by Section 1981, and NYSHRL.

7.  At all times material, EXCELLUS BLUECROSS BLUESHIELD, INC., ("DEFENDANT") was and is part of a $6 billion family of companies that finances and delivers health care services across upstate New York and provides long-term care insurance nationwide. DEFENDANT's headquarters are located at 165 Court St, Rochester, NY 14647.

8.  At all times material, PLAINTIFF worked from DEFENDANT's Syracuse branch, located at 333 Butternut Drive Syracuse, NY 13214.

9.  At all times material, PLAINTIFF was employed by DEFENDANT.

10. At all times material, DEFENDANT employed over 50 employees.

11. At all times material, DEFENDANT was an "employer" under Section 1981, and NYSHRL.

## MATERIAL FACTS

12. On or about January 18, 2021, PLAINTIFF was recruited and hired by DEFENDANT as a Contract Negotiation Director II, earning approximately $149,000 annually with a 20% bonus.

13. As a Contract Negotiation Director II, PLAINTIFF's duties and responsibilities included but were not limited to negotiating contracts with individuals and/or complex provider systems for DEFENDANT.

14. Notably, PLAINTIFF was the only Black employee in the entire department.

15. At all times material, PLAINTIFF was qualified for her position.

16. At all times material, PLAINTIFF worked under the supervision of Vice President of Provider Contracting, Jennifer Nichols ("Ms. Nichols").

17. At all times material, PLAINTIFF was an exemplary employee with no write-ups or disciplinary actions throughout her employment.

18. Indeed, in or about July 2021, PLAINTIFF was given a $5000 merit-based bonus. Additionally, PLAINTIFF was then assigned to oversee both the City of New York ("CNY") and South Tier ("So. Tier") regions. As such, PLAINTIFF was the only Director overseeing two regions.

19. In or about August 2021, PLAINTIFF hired Sabrina Robinson ("Ms. Robinson") (a White Woman) for the position of Physical Contract and Specialist Liaison. PLAINTIFF had previously worked with Ms. Robinson and was therefore sure Ms. Robinson would be a great asset for DEFENDANT.

20. PLAINTIFF then asked Physician and Ancillary Liaison for CNY, Ms. Brown (a white woman) and Physician and Ancillary Liaison, Allison Nickerson ("Ms. Nickerson") to meet with Ms. Robinson and assist with any questions Ms. Robinson had.

21. In or about August 2021, PLAINTIFF noticed Ms. Brown was being hostile to Ms. Robinson and Ms. Nickerson and had created a hostile work environment. PLAINTIFF observed Ms. Brown making belittling and condescending statements to Ms. Robinson and Ms. Nickerson.

22. In or about October 2021, Ms. Brown became hostile and aggressive with PLAINTIFF and accused PLAINTIFF of being late for meetings. PLAINTIFF explained that she was at times late for meetings given her position in Leadership, and PLAINTIFF's constant back-to-back scheduling. PLAINTIFF further noted that Ms. Brown had never spoken to white members of

leadership in such an unprofessional manner. Ms. Brown continued to yell at PLAINTIFF and then made derogatory statements regarding Ms. Robinson. PLAINTIFF expressed her disappointment and hurt feelings with Ms. Brown's actions and noted Ms. Brown's unprofessional manner. PLAINTIFF then ended the meeting.

23. PLAINTIFF then ordered her team, Ms. Robinson, and Ms. Nickerson, to "cc" PLAINTIFF on any emails with Ms. Brown in order to monitor any further harassment. PLAINTIFF further escalated PLAINTIFF's concerns of harassment to Ms. Nichols. In turn, Ms. Nichols reported the harassment to HR.

24. In the days that followed, HR investigated the case and interviewed PLAINTIFF, Ms. Robinson, and Ms. Nickerson. However, Ms. Nickerson declined to escalate the case further, fearing DEFENDANT's retaliation.

25. HR never formally concluded the investigation, and never submitted a final report as to the investigation. Ms. Brown was never disciplined or written up for her harassment.

26. In or about February 2022, DEFENDANT began interviewing candidates for the position of Senior Manager of Contract Negotiation.

27. In or about February 2022, PLAINTIFF interviewed Katrina Best ("Ms. Best") (Black woman) for the position. Ms. Best had a stellar resume, extensive work experience, was currently an employee of DEFENDANT, and came highly recommended by DEFENDANT's Medical Director (name unknown) and Ms. Best's Direct Supervisor (name unknown).

28. As such, PLAINTIFF recommended Ms. Best be offered the position of Senior Manager of Contract Negotiation. Ms. Nichols immediately stated Ms. Best would not be considered for the position and offered no explanation or justification. Instead, Ms. Nichols dismissed Ms. Best's application and suggested Ms. Best seek mentorship from Vice President of Provider

Contracting, Tony Vitagiliano ("Mr. Vitagiliano").

29. PLAINTIFF then recommended PLAINTIFF hire Ms. Amanda Zimmerman ("Ms. Zimmerman") (white woman) as the Senior Manager of Contract Negotiation. Ms. Nichols immediately agreed.

30. PLAINTIFF later learned Mr. Vitagiliano only met with Ms. Best a handful of times, and provided no assignments, insight, or assistance to further Ms. Best's career into Management.

31. Therein PLAINTIFF realized, DEFENDANT had no intentions of hiring any other Black employees as Management.

32. In or about April 2022, PLAINTIFF received another great performance review. During the performance review, Ms. Nichols stated Ms. Nichols was invested in PLAINTIFF's success, but claimed Ms. Nichols could not list PLAINTIFF as "high performing" only because it was PLAINTIFF's first year. No substantive reasons or justifications were provided as to why PLAINTIFF could not be labeled as "high performing" despite PLAINTIFF's well documented stellar performance.

33. Nevertheless, in or about April 2022, PLAINTIFF received another 20% merit-based bonus.

34. In or about April 2022, PLAINTIFF presented to the entire organization in a "Morning Coffee Chat" segment as a panelist. Ms. Nichols was impressed by PLAINTIFF's presentation and expressed interest in assigning PLAINTIFF lobbyist duties. Ms. Nichols further complimented PLAINTIFF by stating PLAINTIFF was a "great communicator, relationship builder, and connector."

35. In or about May 2022, PLAINTIFF, Mary Stubley ("Ms. Stubley"), and David Barber ("Mr. Barber"), met with clients Maud White ("Ms. White") and David Florman ("Mr. Florman"). During the meeting, Mr. Florman excused himself claiming he had to meet with

DEFENDANT's VP, Mr. Vitagliano. However, Mr. Florman failed to properly disconnect from the zoom call. As such, PLAINTIFF, and the rest of the team, heard Mr. Florman tell Mr. Vitagliano, "Remember when you told me [PLAINTIFF] relies on legal too much? Yeah, you are right. She does." Mr. Florman later apologized, Mr. Vitagliano did not.

36. PLAINTIFF was shocked to learn Mr. Vitagliano would make such a demeaning and offensive comment regarding PLAINTIFF to a client. Such comments undermined PLAINTIFF's ability to negotiate agreements. Further, such comments would not be made of the white male Directors.

37. In or about May 2022, Ms. Robinson asked to speak with PLAINTIFF privately. Therein, Ms. Robinson complained to PLAINTIFF of further harassment by Ms. Brown. PLAINTIFF then escalated the complaints to Ms. Nichols.

38. The following day, PLAINTIFF asked Ms. Nichols to meet with Ms. Robinson to discuss the new complaints of race discrimination and harassment by Ms. Brown. Ms. Nichols agreed. PLAINTIFF further stated PLAINTIFF was uncomfortable with the complaints against Ms. Brown and feared PLAINTIFF would be retaliated against and seen as "a problem" for supporting another Black employee. Ms. Nichols offered no response to PLAINTIFF's concerns.

39. In or about May 25, 2022, Ms. Nichols, Ms. Robinson, and HR met. There, Ms. Robinson reported Ms. Brown's continued harassment, hostile work environment, and race discrimination towards Ms. Robinson and PLAINTIFF.

40. On or about June 13, 2022, Ms. Nichols held a meeting with her direct reports and HR to discuss restructuring the department. During the meeting, Ms. Brown abruptly presented a proposal to move Ms. Robinson from PLAINTIFF's team to Ms. Brown's team. This change

removed PLAINTIFF's only support staff and placed Ms. Robinson with her harasser. This was essentially a demotion to PLAINTIFF, as PLAINTIFF was then the only Director with no support staff. Notably, the white male Directors maintained their support staff.

41. On or about June 14, 2022, during a meeting with Ms. Nichols and PLAINTIFF, Ms. Robinson again reported concerns of race discrimination and harassment by Ms. Brown.

42. On or about June 15, 2022, Ms. Nichols contacted PLAINTIFF and asked if PLAINTIFF felt Ms. Brown "treated [PLAINTIFF] differently." PLAINTIFF agreed and noted Ms. Brown had always treated PLAINTIFF differently as compared to the white male Directors by refusing to share work data, by excluding PLAINTIFF from emails pertinent to PLAINTIFF's position, by refusing to work with PLAINTIFF, and by purposely not inviting PLAINTIFF to Director meetings and inviting only the white male directors.

43. On or about June 24, 2022, PLAINTIFF met with HR, Ms. Brown, and Ms. Nichols via a Zoom call. During the meeting, Ms. Brown denied all allegations. Shockingly, Ms. Nichols then defended Ms. Brown and blamed PLAINTIFF for the hostility between Ms. Brown and Ms. Robinson, claiming PLAINTIFF was a "barrier." PLAINTIFF was shocked and offended by Ms. Nichol's hostile tone during the meeting.

44. On June 28, 2022, Ms. Nichols emailed Ms. Robinson, Ms. Brown, and Ms. Zimmerman stating Ms. Robinson was assigned to work on a project under Ms. Brown's leadership. Ms. Nichols never informed PLAINTIFF of this decision, nor did Ms. Nichols seek PLAINTIFF's approval. PLAINTIFF later learned Ms. Robinson was being forced to work on an unrealistic project, with an unreasonable deadline which would conflict with Ms. Robinson's planned vacation.

45. In the days following PLAINTIFF's complaints of race discrimination, harassment, and a

hostile work environment, Ms. Nichols began retaliating against PLAINTIFF by avoiding PLAINTIFF's emails, consistently rescheduling meetings with PLAINTIFF, assigning PLAINTIFF's support staff to work on different teams, and by treating PLAINTIFF with hostility and animosity.

46. In or about July 2022, PLAINTIFF was working on finalizing an agreement with a major client, The River Hospital ("River Hospital"). PLAINTIFF's predecessor, Mr. Brown would typically amend River Hospital's agreement to the max budget every year. PLAINTIFF followed the provisions already stated in River Hospital's 2021 agreement and ensured there was no increase for 2022. As such, River Hospital had a max budget of 2.4% for the entire year.

47. In the days that followed, River Hospital complained that Mr. Brown was not returning their calls. Therefore, PLAINTIFF transitioned them to an APG reimbursement (savings for Medicaid line of business). This covered their facility at the lowest reimbursement rate set in DEFENDANT's system. By the end of the deal, PLAINTIFF's 2022 budget for the client was 2.4% and PLAINTIFF's 2023 budget for the client was 7.5%. This agreement only used a quarter of the budget and established continued business and revenue for DEFENDANT as River Hospital would then be "rolled forward" in future years at a 0% trend.

48. On or about July 14, 2022, PLAINTIFF finally met with Ms. Nichols to execute the River Hospital Agreement. Ms. Nichols however had no interest in the conversation, dismissed the importance of the agreement, and stated Ms. Nichols understood PLAINTIFF's strategy as "River is a very small and low utilization hospital." Ms. Nichols voiced no concerns with PLAINTIFF's strategy or agreement. Therefore, PLAINTIFF emailed Ms. Nichols' a copy of PLAINTIFF's Renewal Agreement Strategy and proceeded with the agreement.

49. As of July 21, 2022, the negotiations with River Hospital were not finalized, and no agreement

had been signed.

50. On or about July 21, 2022, DEFENDANT terminated PLAINTIFF's employment claiming PLAINTIFF's agreement with River Hospital put DEFENDANT in a "difficult position." PLAINTIFF was offered no further explanations or justifications as to her termination.

51. Notably, River Hospital is DEFENDANT's smallest critical access hospital in DEFENDANT's network. PLAINTIFF's agreement was below budget and ensured DEFENDANT's continued profit in the future years with the option to not increase reimbursement rates for the client. Further, the agreement was structured to ensure $25 million in revenue for DEFENDANT beginning in 2023.

52. On or about July 22, 2022, Ms. Robinson informed PLAINTIFF that immediately after PLAINTIFF's termination, DEFENDANT did in fact execute PLAINTIFF's agreement with River Hospital, as per PLAINTIFF's negotiations with no change in terms.

53. DEFENDANT terminated PLAINTIFF's employment for pretextual reasons. Notably, PLAINTIFF is aware of at least two Directors employed by DEFENDANT which created agreements that cost DEFENDANT between $500,000 and $1,000,000 each. Both Directors remain employed by DEFENDANT and faced no disciplinary actions.

54. Specifically, Mr. Brown once boasted that Mr. Brown had made an error which cost DEFENDANT "millions of dollars." However, Ms. Nichols supported Mr. Brown, and ensured Mr. Brown kept his position without any disciplinary actions. Mr. Brown was never terminated despite costing DEFENDANT $1,000,000 in losses. Instead, Mr. Brown was later promoted.

55. Further, Paul Gandolfo ("Mr. Gandolfo") once erroneously reported to the former President, Chris Booth ("Mr. Booth"), that DEFENDANT owed a client $500,000. Mr. Booth therein

contacted the client and promised prompt payment. Mr. Gandolfo later admitted his error and realized DEFENDANT did not owe the client $500,000. Nevertheless, DEFENDANT was forced to issue a $500,000 payment to the client as Mr. Booth had already agreed to it. Mr. Gandolfo was not terminated despite costing DEFENDANT $500,000.

56. DEFENDANT, through its Managers and Directors, discriminated against PLAINTIFF on the basis of PLAINTIFF's race (African American) as evidenced by DEFENDANT refusing to share work data with PLAINTIFF; by purposefully excluding PLAINTIFF from emails pertaining to PLAINTIFF's position; by refusing to work with PLAINTIFF on projects; by purposely excluding PLAINTIFF from Director meetings and only inviting the white male directors; by making demeaning comments regarding PLAINTIFF to clients; by treating PLAINTIFF with hostility and animosity; by refusing to hire other Black employees without reason despite their stronger qualifications; by denying PLAINTIFF opportunities for professional growth; by holding restructuring meetings and removing PLAINTIFF's support staff without PLAINTIFF's input or approval; and ultimately by terminating PLAINTIFF's employment for pretextual reasons. Notably, PLAINTIFF was the only Black Director, and the only Director to be purposefully isolated, excluded, demeaned, and terminated.

57. Further, DEFENDANT, through its Managers and Directors, discriminated against PLAINTIFF on the basis of PLAINTIFF's sex/gender (female) as evidenced by DEFENDANT purposefully excluding PLAINTIFF from emails pertaining to PLAINTIFF's position but including all white male Directors; by refusing to work with PLAINTIFF on projects; by purposely excluding PLAINTIFF from Director meetings and only inviting the white male directors; by making demeaning comments regarding PLAINTIFF to clients; by holding restructuring meetings and removing PLAINTIFF's support staff without PLAINTIFF's

10

presence, input, or approval; and ultimately by terminating PLAINTIFF's employment for pretextual reasons.

58. PLAINTIFF complained to Management and HR multiple times regarding race discrimination, harassment, and a hostile work environment. Despite PLAINTIFF's detailed complaints, HR failed to properly investigate the matter or discipline any culpable parties.

59. DEFENDANT then retaliated against PLAINTIFF for complaining to Management and HR by ignoring PLAINTIFF's emails; canceling PLAINTIFF's meetings; treating PLAINTIFF with hostility and animosity; denying PLAINTIFF opportunities for new responsibilities or professional growth; removing PLAINTIFF's support staff without PLAINTIFF's approval or input, which was in effect essentially a demotion; and by terminating PLAINTIFF's employment for pretextual reasons.

60. To date, DEFENDANT has failed to properly investigate or remedy PLAINTIFF's complaints of race discrimination, harassment, and a hostile work environment.

61. Notably, DEFENDANT has a well-documented history of discriminating against Black employees. Kevin Leyseth ("Mr. Leyseth"), Joseph Searles ("Mr. Searles") and LaRhonda Williams ("Ms. Williams") were all Black employees of DEFENDANT that also faced racial discrimination, harassment, and retaliation by DEFENDANT.

62. As a result of DEFENDANT's actions, PLAINTIFF feels extremely humiliated, degraded, victimized, embarrassed, traumatized and emotionally distressed.

63. As a result of DEFENDANT's actions, PLAINTIFF has suffered a loss of quality in life, depression, and financial distress. PLAINTIFF has further suffered a loss of self-esteem, confidence and reputation. PLAINTIFF notes PLAINTIFF is affiliated with multiple community organizations and believes DEFENDANT's actions have tarnished PLAINTIFF's

11

reputation.

64. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered and will continue to suffer the loss of income, benefits, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. PLAINTIFF further experienced severe emotional and physical distress.

**FIRST CAUSE OF ACTION**
**FOR RACE DISCRIMINATION UNDER SECTION 1981**

65. PLAINTIFF repeats and realleges each and every allegation in paragraphs one through ninety.

66. 42 U.S.C. § 1981 states in relevant part as follows:

> All persons within the jurisdiction of the United States shall have the same right in  every State and Territory to make and enforce contracts, to sue, be parties, give  evidence, and to the full and equal benefit of all laws and proceedings for the security  of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no  other.

67. As described herein, DEFENDANT engaged in unlawful employment practices prohibited by Section 1981, by discriminating against PLAINTIFF on the basis of her race (African American) by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of PLAINTIFF and other employees based on race.

68. DEFENDANT engaged in unlawful employment practices prohibited by Section 1981, by discriminating against PLAINTIFF on the basis of PLAINTIFF's race (African American) by creating a hostile work environment in which PLAINTIFF was subjected to race based discriminatory treatment as described herein.

69. As a result of DEFENDANT's unlawful discriminatory conduct in violation of the Section

1981, PLAINTIFF has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

70. As a result of the unlawful discriminatory conduct of DEFENDANT in violation of Section 1981, PLAINTIFF has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

71. The unlawful discriminatory actions of DEFENDANT constitutes malicious, willful, and wanton violations of Section 1981, for which PLAINTIFF is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER SECTION 1981**

72. PLAINTIFF repeats and realleges each and every allegation in paragraphs one through ninety-seven.

73. Though the plain language of § 1981 does not specifically reference retaliation, the view that § 1981 "encompasses retaliation claims is indeed well-embedded in the law." see CBOCS West Inc. v. Humphries, 553 U.S. 442, 128 S.Ct. 1951, 1957–58, 170 L.Ed.2d 864 (2008) [holding that Section 1981 of the Civil Rights Act of 1866 unequivocally includes claims of retaliation by those pursuing race and color claims under the statute.]

74. As described herein, PLAINTIFF engaged in activities protected by Section 1981 by complaining to Management and Human Resources of DEFENDANT's ongoing harassment and racial discrimination against PLAINTIFF and other Black employees.

75. As described herein, immediately after PLAINTIFF engaged in activities protected by Section 1981, DEFENDANT retaliated against PLAINTIFF by creating an even more hostile work

13

environment by ignoring PLAINTIFF's emails; canceling PLAINTIFF's meetings; treating PLAINTIFF with hostility and animosity; denying PLAINTIFF opportunities for new responsibilities or professional growth; removing PLAINTIFF's support staff without PLAINTIFF's approval or input, which was in effect essentially a demotion; and by terminating PLAINTIFF's employment for pretextual reasons.

76. DEFENDANT would not have retaliated against PLAINTIFF but for PLAINTIFF's complaints of racial discrimination and harassment.

77. Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar complaint of discrimination.

78. As a result of DEFENDANT's retaliatory conduct in violation of Section 1981, PLAINTIFF has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

79. DEFENDANT's unlawful discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which PLAINTIFF is entitled to the maximum allowable damages under this statute and an award of punitive damage.

### THIRD CAUSE OF ACTION
### FOR RACE DISCRIMINATION UNDER THE NYSHRL

80. PLAINTIFF repeats and realleges each and every allegation in paragraphs one through one hundred and five.

81. New York State Executive Law §296(1)(a) provides that

It shall be an unlawful discriminatory practice: For an employer or licensing

agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. (Emphasis added)

82. As described herein, DEFENDANT engaged in unlawful employment practices prohibited by NYSHRL, by discriminating against PLAINTIFF on the basis of her race (African American) by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of PLAINTIFF and other employees based on race.

83. DEFENDANT engaged in unlawful employment practices prohibited by NYSHRL, by discriminating against PLAINTIFF on the basis of PLAINTIFF's race (African American) by creating a hostile work environment in which PLAINTIFF was subjected to race based discriminatory treatment as described herein.

84. As a result of DEFENDANT's unlawful discriminatory conduct in violation of the NYSHRL, PLAINTIFF has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

85. As a result of the unlawful discriminatory conduct of the DEFENDANT in violation of NYSHRL, PLAINTIFF has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which PLAINTIFF is entitled to an award of monetary damages and other relief.

86. The unlawful discriminatory actions of DEFENDANT's constitute malicious, willful, and wanton violations of NYSHRL, for which PLAINTIFF is entitled to the maximum allowable damages under this statute and an award of punitive damages.

15

## FOURTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE NYSHRL

87. PLAINTIFF repeats and realleges each and every allegation in paragraphs one through one hundred and nineteen.

88. Executive Law § 296 provides that:

> "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

89. As described herein, PLAINTIFF engaged in activities protected by NYSHRL by complaining to Management and Human Resources of DEFENDANT's ongoing harassment and racial discrimination against PLAINTIFF and other Black employees.

90. As described herein, immediately after PLAINTIFF engaged in activities protected by NYSHRL, DEFENDANT retaliated against PLAINTIFF by creating an even more hostile work environment by ignoring PLAINTIFF's emails; canceling PLAINTIFF's meetings; treating PLAINTIFF with hostility and animosity; denying PLAINTIFF opportunities for new responsibilities or professional growth; removing PLAINTIFF's support staff without PLAINTIFF's approval or input, which was in effect essentially a demotion; and by terminating PLAINTIFF's employment for pretextual reasons.

91. DEFENDANT would not have retaliated against PLAINTIFF but for PLAINTIFF's complaints of racial discrimination and harassment.

92. Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar complaint of discrimination.

93. As a result of DEFENDANT's unlawful conduct in violation of the NYSHRL, PLAINTIFF has suffered, and continues to suffer, economic loss, for which PLAINTIFF is entitled to an

16

award of monetary damages and other relief.

94.   As a result of the unlawful conduct of the DEFENDANT in violation of NYSHRL, PLAINTIFF has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which PLAINTIFF is entitled to an award of monetary damages and other relief.

95.   The unlawful discriminatory actions of DEFENDANT constitute malicious, willful, and wanton violations of NYSHRL, for which PLAINTIFF is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

96.   PLAINTIFF requests a jury trial on all issues to be tried.

**WHEREFORE**, PLAINTIFF respectfully requests a judgment against the DEFENDANT:

A.   Declaring that DEFENDANT engaged in unlawful employment practices prohibited by Section 1981, and NYSHRL, in that DEFENDANT discriminated against PLAINTIFF on the basis of PLAINTIFF's race.

B.   Declaring that PLAINTIFF has been damaged in an amount in excess of the jurisdiction of the Court;

C.   Awarding damages to PLAINTIFF for all lost wages and benefits resulting from DEFENDANT's unlawful discrimination and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

D.   Awarding PLAINTIFF compensatory damages for mental, emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

E.   Awarding PLAINTIFF punitive damages;

17

F.      Awarding PLAINTIFF attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

G.      Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just and proper to remedy DEFENDANT's unlawful employment practices.


Dated: Garden City, New York
       October 7, 2022

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By:     _____/s/_____
        Steven Fingerhut
        Margorie Mesidor
        (NDNY admission pending;
        *pro hac vice* pending)
        585 Stewart Avenue, Suite 430
        Garden City, New York 11530
        T: (212) 248-7431
        F: (212) 901-2107


**THE WASHINGTON LAW FIRM,
PLLC**

By:     _____/s/_____
        Melissa Washington
        (*pro hac vice* pending)
        114 John Street, Suite 312
        New York, New York 10002
        T: (646) 770-3440
        F: (646) 400-0614