UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SHERI RODRIGUEZ,

     Plaintiff,

  -v-            5:22-CV-1050 (AJB/PJE)

EXCELLUS HEALTH PLAN, INC.,

     Defendant.

**Hon. Anthony Brindisi, U.S. District Judge:**

**<u>DECISION and ORDER</u>**

**I.  INTRODUCTION**

On October 4, 2022, Sheri Rodriguez ("plaintiff"), a former employee of Excellus Health

Plan Inc. ("defendant"), filed this civil rights action alleging that defendant discriminated and

retaliated against her in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C.

§ 1981, and the New York State Human Rights Law ("NYSHRL").  *See* Dkt. No. 1 ("Compl.").[1]

Specifically, plaintiff alleges that, during the course of her employment with defendant,

she raised concerns regarding the conduct of a coworker whom she perceived as hostile and

dismissive, and who, at times, treated her differently from certain white colleagues.  *See* Compl.

Plaintiff further alleges that, after management and human resources personnel became aware of

those concerns, defendant terminated her employment under circumstances she contends were

discriminatory and retaliatory.  *See id.*

---

[1] This action was initially assigned to U.S. District Judge Glenn Suddaby.  On December 1, 2022, defendant moved
to dismiss plaintiff's complaint.  *See* Dkt. No. 14.  On January 17, 2024, Judge Suddaby granted defendant's motion
in part, dismissing plaintiff's hostile work environment claims under § 1981 and the NYSHRL, as well as plaintiff's
§ 1981 gender discrimination claim.  Plaintiff's race discrimination and retaliation claims under both § 1981 and the
NYSHRL, along with her NYSHRL gender discrimination claim, remained at issue.  *See* Dkt. No. 19.  One year
later, on January 17, 2025, this action was reassigned to U.S. District Judge Anthony Brindisi.  *See* Dkt. No. 42.

Following the close of discovery, defendant moved under Rule 56 of the Federal Rules of Civil Procedure for summary judgment.  Dkt. No. 60.  That motion has been fully briefed, Dkt. Nos. 63, 66, and will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND[2]

On January 18, 2021, defendant hired plaintiff, an African-American female, as a Regional Provider Contract Negotiation Director II.  Pl.'s Resp. to Def.'s Facts ("Pl.'s Resp."), Dkt. No. 63-1 ¶ 6.  In that role, plaintiff was responsible for negotiating and managing contract terms and reimbursement rates between Excellus and healthcare providers, with authority to enter into binding agreements on defendant's behalf.  *Id.* ¶¶ 8–9; Pl.'s Dep. Day 1 (Pl.'s Excerpts), Dkt. No. 63-5 at 17–18.[3]  Plaintiff reported to the vice president for provider contracting and administration, Jennifer Nichols ("VP Nichols"), and worked alongside other contract directors assigned to different regions in Upstate New York.  Pl.'s Add'l Facts ("Pl.'s Facts"), Dkt. No. 63-1 ¶¶ 3, 6–7.

Plaintiff supervised several employees, including Amanda Zimmerman, Sabrina Robinson, and Allison Nickerson, and was responsible for provider contracting in the Central New York and Southern Tier regions.  Pl.'s Resp. ¶¶ 30–33, 35; Pl.'s Dep. Day 1 (Pl.'s Excerpts), Dkt. No. 63-5 at 18–20.  Zimmerman, Robinson, and Nickerson are white females. Pl.'s Resp. ¶¶ 32–36.

---

[2] The following facts are taken from a comparison of the parties' Local Rule 56.1 Statements.  *Compare* Dkt. No. 60-15, *with* Dkt. No. 63-1.  Because plaintiff is the non-movant, the Court will adopt her version of events, to the extent those events are supported with non-conclusory citations to the record in accordance with the requirements of Local Rule 56.1.

[3] Citations to the parties' briefing and exhibits refer to the CM/ECF-generated pagination.  Both plaintiff and defendant have submitted excerpts of various deposition transcripts as exhibits.  To avoid confusion, the Court will denote the source of each transcript.

In February 2022, plaintiff raised concerns to her supervisor, VP Nichols, regarding the conduct of a white female coworker, Christie Brown ("Brown").  *See* Pl.'s Resp. ¶¶ 39, 45–52.  Brown, like plaintiff, reported directly to VP Nichols, and plaintiff and Brown neither supervised nor had any managerial authority over each other.  *Id.* ¶ 40; Pl.'s Dep. Day 1 at 23.

Plaintiff told VP Nichols that Brown's conduct was, at times, rude, dismissive, and undermining, and that members of plaintiff's team—specifically Robinson and Nickerson—had similar concerns.  *See* Pl.'s Resp. ¶¶ 45–52; Pl.'s Facts ¶¶ 27–30, 32.  Plaintiff further told VP Nichols that Robinson and Nickerson felt "bullied" by Brown and that Nickerson had reported that Brown "beats up on" Dan Kane, a white male contract director.  Pl.'s Resp. ¶¶ 46–47.  Neither Robinson nor Nickerson offered any explanation to plaintiff as to why they believed Brown was bullying them.  *Id.* at ¶ 48.

The parties agree that plaintiff complained to her supervisor about Brown but dispute the scope of plaintiff's, Robinson's, and Nickerson's complaints.  *See, e.g.*, Pl.'s Resp. ¶ 45.  Plaintiff and defendant also seem to agree that the majority of plaintiff's concerns were raised on behalf of Robinson and Nickerson.  *Id.* ¶ 52; *see also* Pl.'s Dep. Day 1 at 60 ("My meeting with [Nichols] was more so a concern from [Robinson's] and [Nickerson's] interactions with [Brown] . . . they felt [] they were being bullied by her.  So my conversations [] with [] Nichols were really around [Robinson's] and [Nickerson's] experiences working with [Brown] and less about myself.").  To that end, plaintiff asked Robinson and Nickerson to copy her on all further emails with Brown.  Pl.'s Facts ¶ 27; Pl.'s Dep. Day 2 (Pl.'s Excerpts), Dkt. No. 63-12 at 5; Robinson Dep. (Pl.'s Excerpts), Dkt. No. 63-7 at 19–20.

Notably, however, plaintiff also appears to contend that the impetus for the meeting with VP Nichols, rather than solely Robinson's and Nickerson's concerns regarding Brown's

treatment of them, was an incident in which Brown allegedly yelled at plaintiff during a meeting, prompting plaintiff to report Brown's conduct to VP Nichols after concluding that she could no longer tolerate Brown's behavior.  *See* Pl.'s Facts ¶ 33; Pl.'s Dep. Day 1 at 56–57.

The parties agree that plaintiff brought up that yelling incident at the February 2022 meeting between plaintiff and VP Nichols.  *See* Pl.'s Resp. ¶ 51.  Plaintiff also maintains that, at that time, she raised complaints that Brown yelled at her, withheld analytics information needed for provider negotiations, and treated plaintiff differently than other directors within the department.  *See* Pl.'s Resp. ¶¶ 45, 51; Pl.'s Facts ¶¶ 27–33; Pl.'s Dep. Day 1 at 8.

Plaintiff further testified that she perceived broader, leadership-level disparities between her treatment and that of her white coworkers, including with respect to workload distribution, scrutiny of mistakes, and disciplinary expectations.  *See* Pl.'s Dep. Day 1 at 43–44.  Plaintiff did not appear to raise these broader concerns with VP Nichols at the time.  *See id.*

Plaintiff expressed discomfort in raising these concerns, noting both her relatively recent arrival at Excellus and her status as a "leader of color."  Pl.'s Resp. ¶ 53; *see also* Pl.'s Dep. Day 1 at 64.  While defendant maintains that, at the time, plaintiff did not attribute Brown's conduct to any sort of discrimination, plaintiff asserts that her concerns "certainly invoked racial bias."  Pl.'s Resp. ¶ 53; *see also* Pl.'s Dep. Day 1 at 64 ("I do remember stating that as a black leader, I did not want to be problematic . . . I was very conscious of perception at the time.").

Plaintiff, during her deposition, stated that she never made an explicit complaint about discrimination during her employment.  *See* Pl.'s Dep. Day 2 (Def.'s Excerpts), Dkt. No. 60-9 at 9 ("Q: At any time during your employment with Excellus, did you make a complaint about discrimination?  A: Not during my employment, no.").  Following plaintiff's complaints, VP Nichols involved Excellus's human resources department.  Pl.'s Resp. ¶ 55.

On May 25, 2022, Robinson, one of plaintiff's direct reports, reiterated concerns regarding Brown's conduct directly to VP Nichols and suggested that Brown's conduct might be related to race, although the parties dispute the extent and basis of that assertion. *See* Pl.'s Resp. ¶¶ 56–58; Pl.'s Facts ¶¶ 33–35; Robinson Dep. at 12, 24 (describing Brown's attitude towards plaintiff as resembling "derogatory racial hate . . . or something" and maintaining that she specifically mentioned concerns about racially-motivated conduct at the time).

According to a written summary of the May meeting between VP Nichols and Robinson during which Robinson expressed her concerns, Robinson stated that Brown's behavior was "possibly 'race related with [plaintiff],'" but that she did "not have specific evidence, and '[was] not accusing [Brown] of that.'" *See* Robinson Meeting, Dkt. No. 63-9.

Following this conversation, VP Nichols contacted human resources employee Monique Wallenhorst, who spoke with Robinson regarding her complaints about Brown. Pl.'s Resp. ¶¶ 59–61. At that time, Robinson reiterated her belief that Brown's conduct towards plaintiff was racially motivated. *Id.* at ¶ 61.

The parties dispute the source of Robinson's grievances. *See* Pl.'s Resp. ¶ 61. According to plaintiff, Robinson observed Brown wearing a shirt with a Confederate flag image on social media, which contributed to her perception that race was a factor in Brown's ongoing mistreatment of plaintiff. Pl.'s Resp. ¶ 61; Pl.'s Facts ¶ 35; Robinson Dep. at 14. However, defendant contends that Robinson characterized her basis for her concerns as a "gut feeling." Pl.'s Resp. ¶ 61.

Wallenhorst, in her capacity as an HR employee, then escalated plaintiff's concerns to employee relations manager Jamie DeFonde, who, in turn, consulted with ethics department employee Francine Shea. Pl.'s Resp. ¶¶ 62–63. Members of the employee relations and ethics

departments subsequently facilitated meetings involving plaintiff, VP Nichols, Brown, Robinson, and employee relations and ethics personnel. The parties disagree as to the exact or precise nature of these meetings. According to defendant, its ethics team undertook an investigation into Robinson's complaint. *See id.* ¶ 63; Wallenhorst Dep. (Pl.'s Excerpts), Dkt. No. 63-8 at 9 ("Any[] time complaints around discrimination occur, we pull in ethics."). However, plaintiff characterizes the meetings as efforts to address team dynamics and communication issues rather than a meaningful investigation into the complaint. *See* Pl.'s Resp. ¶¶ 62–63; DeFonde Dep. (Pl.'s Excerpts), Dkt. No. 63-11 at 13 (Q: "Can we call this an investigation?" A: "No.").

On June 14, 2022, plaintiff raised further concerns to VP Nichols about Brown's conduct. Pl.'s Facts ¶ 38; Pl.'s Resp. ¶ 64. During that conversation, plaintiff told Nichols that Brown treated her differently than the other directors on her team, both of whom were white men. Pl.'s Resp. ¶ 65; Pl.'s Dep. Day 2 at 6–19.

On that same day, DeFonde, defendant's manager of employee relations, met with Robinson to discuss Robinson's concerns. Pl.'s Resp. ¶ 67. At that time, Robinson brought up a recent news event involving a racially motivated shooting. *Id.* ¶ 69. DeFonde subsequently discussed the complaints about Brown's conduct with Shea, an ethics department representative, and determined that there were no discrimination concerns. *Id.* ¶¶ 71–73. Thereafter, DeFonde held a series of three meetings between herself, Wallenhorst, Brown, Robinson, and VP Nichols. *See id.* ¶¶ 73–77. Following the meetings, plaintiff did not raise any further complaints about Brown's conduct. *Id.* ¶ 78.

On June 14, 2022, plaintiff attended a hospital strategic-planning review meeting, during which participants conducted a SWOT (strengths, weaknesses, opportunities, and threats) analysis. Pl.'s Resp. ¶ 79. There, senior vice president of provider network engagement Antonio

Vitagliano delivered a presentation.  According to defendant, during this presentation, Vitagliano instructed contract directors that mid-term reimbursement rate increases were not to be extended without his advance approval.  *See* Pl.'s Resp. ¶¶ 12, 79–85; Declaration of Antonio Vitagliano ("Vitagliano Dec."), Dkt. No. 60-4 ¶¶ 1, 3.  The parties dispute the scope of Vitagliano's presentation and the extent to which it altered existing contracting practices.  *See id.*; Pl.'s Facts ¶ 62–64.  According to plaintiff, Vitagliano did not issue an absolute prohibition on such rate increases.  *See* Pl.'s Resp. ¶ 81.  Notably, Vitagliano's June pre-approval directive was neither put into writing nor otherwise formalized as policy.  *See* Vitagliano Dep. (Pl.'s Excerpts), Dkt. No. 63-3 at 30–31.

At the time, plaintiff was responsible for managing the contract between Excellus and River Hospital.  Pl.'s Resp. ¶ 86.  The contract had been renewed for 2022 at a 0% rate increase after the provider did not seek renegotiation.  *Id.* ¶¶ 87–91; Pl.'s Dep. Day 1 at 26.  In July 2022, plaintiff reopened the contract to negotiate a rate adjustment.  Pl.'s Resp. ¶ 92.

On July 7, 2022, plaintiff extended an offer providing for a 2.4% rate increase effective September 1, 2022, along with a subsequent increase effective January 1, 2023.  Pl.'s Resp. ¶ 93.  River Hospital accepted and executed the amendment that same day.  *Id.* ¶ 94.  Plaintiff thereafter forwarded the executed amendment to VP Nichols for her countersignature.  Pl.'s Resp. ¶ 95.  Plaintiff did not consult with Vitagliano before extending this offer to River Hospital.  *Id.* ¶ 98; Vitagliano Dec. ¶ 5.

The parties disagree as to the extent to which VP Nichols was aware of plaintiff's plans to offer River Hospital a mid-term rate increase.  *See* Pl.'s Resp. ¶¶ 95–98.  Plaintiff maintains that she verbally discussed the potential increase with Nichols before extending the amendment.  *See* Pl.'s Dep. Day 1 at 35–36.  Further, plaintiff concedes that she did not obtain prior approval

from Vitagliano but contends that she does not remember Vitagliano issuing an "absolute prohibition" on such rate increases. Pl.'s Resp. ¶ 98; *see also* Pl.'s Dep. Day 1 at 24.

In her deposition, plaintiff stated that she did not "recall [ ] Vitagliano giving a directive not to offer mid-contract reimbursement rate increases," or any other directive, during the June 2022 meeting. Pl.'s Dep. Day 1 at 24. She also maintained that, with respect to the 2022 rate increase, plaintiff "work[ed] directly with the data analytics team to determine what would be the most cost-effective solution for Excellus and also give River Hospital some security," with an eye towards "helping [the parties] to move into a long-term agreement." *Id.* at 34. The parties dispute the financial impact of plaintiff's offer. *See* Pl.'s Resp. ¶ 102.

Defendant terminated plaintiff's employment on July 19, 2022. Pl.'s Resp. ¶ 108. Defendant attributes plaintiff's termination to her failure to either follow the June 2022 directive or to seek advance approval from Vitagliano before reopening the River Hospital contract. *See* Declaration of Jennifer Nichols ("Nichols Dec."), Dkt. No. 60-1 ¶ 44. VP Nichols, Vitagliano, and DeFonde were involved in the decision to terminate plaintiff. Pl.'s Resp. ¶ 107.

Plaintiff identifies several white male employees whom she contends were treated more favorably after committing significant workplace errors. According to plaintiff, defendant commonly utilized progressive disciplinary measures—including performance improvement plans ("PIPs"), coaching, and warnings—when managers exercised poor judgment or made financial or contractual mistakes. *See* Pl.'s Facts ¶ 73. Plaintiff points to testimony from Vitagliano that white male employees under his supervision had previously been placed on PIPs following financial reporting or judgment errors and retained their employment after corrective action, as well as testimony that outright termination was "fairly rare" and generally reserved for "fairly egregious" conduct. *Id.* ¶ 74; Vitagliano Dep. at 12–16.

Plaintiff specifically identifies one unnamed white male manager who allegedly failed to report a financial liability totaling approximately $40 million but was placed on a performance improvement plan rather than terminated.  Pl.'s Facts ¶ 75; Vitagliano Dep. at 14–16.

Plaintiff also points to Al Bradley, a white male contract director who allegedly committed contractual errors misrepresenting financial terms to providers but received a performance correction plan and final written warning instead of termination.  Pl.'s Facts ¶ 76; Vitagliano Dep. at 18.

Further, plaintiff identified an instance in which Vice President Paul Gandolfo mistakenly informed a provider that Excellus owed approximately $500,000 based on an incorrect calculation but remained employed, and another incident in which plaintiff's predecessor, Kurt Brown, allegedly caused "multi-million-dollar losses" without termination or formal discipline. *See* Pl.'s Dep. Day 1 at 43–44, 51–53; Pl.'s Facts ¶¶ 77–78.

Finally, Ryan Donahue, a white male employee who previously reported to VP Nichols, was terminated after extending a contract that he was not authorized to extend.  *See* Pl.'s Facts ¶¶ 123–24.  Unlike plaintiff, however, Donahue held a lower-level position and was not employed as a contract director.  *See id.* at ¶ 125.

## III.   LEGAL STANDARD

The entry of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  In conducting this analysis, the court must draw

all reasonable inferences in the light most favorable to the non-movant.  *Id*. at 255.  Even so,

there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 588 (1986).

## IV.    DISCUSSION

Plaintiff asserts claims under § 1981 and the NYSHRL of racial discrimination (Counts

One and Three) and retaliation (Counts Two and Four) as well as a claim of gender

discrimination under the NYSHRL.[4]  *See* Dkt. No. 1; *see also* Dkt. No. 19.

### A.    Plaintiff's Discrimination Claims

### 1.    Disparate Treatment Race Discrimination

Defendant has moved for summary judgment on plaintiff's § 1981 and NYSHRL racial

discrimination claims.  Section 1981 provides that "[a]ll persons within the jurisdiction of the

United States shall have the same right in every State and Territory to make and enforce

contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a); *see also St. Francis Coll. v.*

*Al-Khazraji*, 481 U.S. 604, 609 (1987).  Under the NYSHRL, it is unlawful for "an employer . . .

because of an individual's . . . race . . . to refuse to hire or employ or to bar or to discharge from

employment such individual or to discriminate against such individual in compensation or in

terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1).

Plaintiff argues that defendant discriminated against her on the basis of her race by

treating her differently than similarly situated white male employees.  For instance, plaintiff

contends that defendant subjected her conduct to greater scrutiny and ultimately terminated her

employment for conduct that would not have resulted in termination for her white counterparts.

---

[4]  Judge Suddaby inferred this gender discrimination claim from plaintiff's pleading.  *See* Dkt. No. 19.  Accordingly, it does not have a corresponding "Count."

In other words, plaintiff claims disparate treatment based on her race.  Defendant denies these allegations and maintains that plaintiff was terminated for a legitimate, non-discriminatory reason—namely, her failure to comply with the June 2022 directive or to obtain advance approval from Vitagliano before reopening the River Hospital contract.

Section 1981 claims for employment discrimination borrow Title VII's substantive standards.  *See, e.g.*, *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).

While a plaintiff may prove an employer's discriminatory intent through direct evidence, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989), an employer's intent and state of mind are "usually unstated."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).  Consequently, most discrimination cases rely on indirect proof, *i.e.*, the "cumulative weight of circumstantial evidence."  *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).

At summary judgment, a plaintiff can establish a disparate treatment claim based on indirect evidence: (1) by showing that the employer's stated reason for the challenged employment action was actually a "pretext" to cover-up unlawful discrimination; or (2) "by otherwise creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination."  *Vega*, 801 F.3d at 87 (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)).

Discrimination claims under Title VII and the NYSHRL are analyzed using the burden-shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See, e.g.*, *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016) ("Claims of . .

- 11 -

. discrimination under Title VII and the NY[S]HRL are analyzed under the familiar burden-shifting framework established in *McDonnell Douglas . . .*").[5]

"Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a *prima facie* case of employment discrimination by showing that: '(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'" *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019)).

"The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct," and "[u]pon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination." *Farmer*, 473 F. Supp. 3d at 324 (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297, 307–08 (2d Cir. 2015)).

Defendant appears to concede—or at least does not dispute for purposes of the instant motion—that plaintiff was a member of one or more protected classes as a black woman.  Nor does defendant dispute, at least for purposes of this motion, that plaintiff was qualified for her position or that her termination constituted an adverse employment action.  After all, "[a]n involuntary termination [is] obviously [] an adverse employment action for purposes of a disparate treatment claim." *Smith v. Dolgen N.Y., LLC*, 2026 WL 809831, at *5 (N.D.N.Y. March 24, 2026) (Hurd, J.).

---

[5]  "The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard of the NYCHRL," *Livingston v. City of N.Y.*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021), which is more relaxed than the pre-amendment NYSHRL standard.  *See Kittle*, 2025 WL 2721620, at *5.  Accordingly, to the extent plaintiff's NYSHRL claims survive under the more demanding federal standards discussed *infra*, they likewise survive under the amended NYSHRL.

Instead, defendant principally argues that plaintiff cannot establish that her termination occurred under circumstances giving rise to an inference of discrimination and, in any event, cannot demonstrate that defendant's stated reason for terminating her employment was pretextual.  *See* Def.'s Mem., Dkt. No. 60-16 at 23–46.

An "[i]nference of discrimination 'is a flexible [standard] that can be satisfied differently in differing factual scenarios.'"  *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. 2014) (quoting *Howard v. MTA Metro–N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011)).  Such circumstances might include, for example, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]."  *Id.* (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)).

As relevant here, a plaintiff may raise an inference of discrimination by demonstrating that she was treated less favorably than similarly situated employees outside of her protected class.  *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  A plaintiff choosing to use this method must show that she is "similarly situated in all material respects" to her proffered comparators.  *Id.* (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."  *Id.* at 40.

Here, plaintiff testified that "white male leaders were able to retain their position" after making significant workplace errors, while she "was held to a different standard."  Pl.'s Dep. Day 1 at 44.  Plaintiff identifies several white male employees who allegedly committed

significant financial or contractual errors but were not terminated.  According to plaintiff, those employees—including an unidentified manager who failed to report a substantial financial liability, contract director Al Bradley, vice president Paul Gandolfo, and plaintiff's predecessor Kurt Brown—either received corrective action short of termination or remained employed despite allegedly similar mistakes.  Pl.'s Dep. Day 1 at 43–44, 51–53; Pl.'s Facts ¶¶ 75–78; Vitagliano Dep. at 14–18.

Defendant argues that this comparator evidence is insufficient to satisfy even plaintiff's minimal burden at step one because many of the alleged incidents are supported only by plaintiff's subjective beliefs or secondhand accounts regarding other employees' conduct and discipline.  Specifically, defendant contends that plaintiff lacks personal knowledge regarding the details of the alleged comparator incidents, including the scope of the employees' responsibilities, the precise nature of their mistakes, and the disciplinary decisions ultimately imposed.  *See* Def.'s Mem. at 27–29.  To the extent plaintiff relies upon statements relayed by other employees regarding alleged mistakes committed by white male coworkers or the discipline they purportedly received, defendant argues that such evidence constitutes inadmissible hearsay that is insufficient to defeat summary judgment.  *See id.*

The Court agrees that portions of plaintiff's comparator evidence are imprecise and, at times, appear to rest upon generalized perceptions or gossip regarding workplace discipline rather than documentary evidence or firsthand knowledge.  For example, the record evidence identified by plaintiff concerning Kurt Brown and Paul Gandolfo lacks detail regarding their specific alleged conduct, the surrounding circumstances, and the decisionmakers involved in any disciplinary process.  *See* Pl.'s Resp. ¶¶ 110, 114 (admitting that "[plaintiff] does not have

- 14 -

personal knowledge about [] Brown's mistakes and errors" and "[p]laintiff has no personal knowledge of [] Gandolfo's alleged mistake.").

Such evidence, at least standing alone, is not enough to establish that those employees were similarly situated to plaintiff in all material respects. *See Chansamone v. IBEW Local 97*, 523 F. App'x 820, 822 n.4 (2d Cir. 2013) (summary order) (declining to consider testimony that defendant-employer would not hire plaintiff due to his race "because that testimony is inadmissible hearsay"); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment.").

Likewise, although plaintiff points to testimony from Vitagliano describing a white male manager who failed to report a significant financial liability and subsequently retained his job, the record contains little detail regarding that employee's responsibilities, supervisory structure, and—perhaps most importantly—his identity. Pl.'s Facts ¶ 75; Vitagliano Dep. at 14–16. This too is insufficient to establish that the unidentified manager was "similarly situated to plaintiff in all material respects." *See Graham*, 230 F.3d at 39–40.[6]

That said, not all the proffered comparator evidence suffers from these defects. Plaintiff also relies upon testimony from Vitagliano regarding disciplinary measures imposed upon another employee, Al Bradley, who shared the same role as plaintiff, including testimony concerning the use of corrective discipline following a significant financial and contractual error. *See* Pl.'s Facts ¶ 76; Vitagliano Dep. at 18. Unlike plaintiff's generalized beliefs regarding

---

[6] Defendant also points out that Vitagliano's deposition suggests—and his declaration confirms—that the unidentified manager was, in fact, a white female. *See* Def.'s Reply, Dkt. No. 66 at 10–11; Vitagliano Dec. ¶ 4. In any event, the record contains insufficient evidence regarding the manager's identity or the circumstances surrounding the alleged misconduct to permit the Court to conclude that the employee was similarly situated to plaintiff in all material respects.

Brown and Gandolfo, the testimony about Bradley is based upon the knowledge of a supervisory employee familiar with the relevant organizational structure and disciplinary practices. *See id.*

Viewed in the light most favorable to plaintiff, this comparator evidence is sufficient to establish a minimal inference of discriminatory treatment. The Bradley comparator evidence, coupled with testimony that termination for performance-related issues was considered "fairly rare" and reserved for "fairly egregious" conduct, Vitagliano Dep. at 16, could permit a reasonable jury to conclude that plaintiff was disciplined more harshly than a similarly situated white male employee who committed a significant financial or contractual error. *See Graham*, 230 F.3d at 40 (plaintiff need not establish that comparators are "identical" in every respect, only that there exists a "reasonably close resemblance of the facts and circumstances").

That conclusion is reinforced by the parties' disputes regarding the seriousness of the River Hospital amendment and the magnitude of plaintiff's error. Although defendant characterizes the amendment as exposing Excellus to substantial financial loss, plaintiff points to testimony suggesting that the purported losses were estimated rather than confirmed and that no retrospective analysis was ever performed to determine whether the company suffered a measurable financial loss from the agreement. Plaintiff also identifies testimony indicating uncertainty regarding the financial impact of the amendment. *See* Pl.'s Resp. ¶ 102; Vitagliano Dep. at 31 (explaining that there is no "document that quantifies the loss allegedly associated with [the contract]").

To be sure, many of the same individuals who participated in plaintiff's hiring also participated in the decision to terminate her employment, which may weigh against an inference of discriminatory intent. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision

to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring."). At summary judgment, however, that inference is not dispositive. *See Feingold v. N.Y.*, 366 F.3d 138, 155 (2d Cir. 2004); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000).

In short, plaintiff has established that her termination occurred under circumstances giving rise to a minimal inference of discrimination. After all, the burden of establishing a *prima facie* case is "not onerous," and "has been frequently described as minimal." *Walsh*, 828 F.3d at 75 (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)). Plaintiff has identified disputed factual issues regarding the nature and scope of the June directive, the extent to which a similarly situated employee was treated differently or more favorably, the financial impact of the amendment, and whether defendant's reliance on the River Hospital incident reflected a genuine business justification or a disproportionate response informed by discriminatory animus. "Given that this [inference of discrimination] hurdle is practically at ground level, [p]laintiff makes a *prima facie* case." *Brown v. Crowdtwist*, 2014 WL 1468145, at *2 (S.D.N.Y. Apr. 15, 2014).

Once, as here, a plaintiff has established a *prima facie* case of unlawful discrimination, the employer must then "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). According to defendant, plaintiff was terminated because she violated the express June directive from Vitagliano barring contract directors from extending mid-term reimbursement rate increases without prior approval and, in doing so, bound defendant to increased reimbursement obligations.

- 17 -

For purposes of the instant motion, defendant has met its duty to articulate a legitimate, nondiscriminatory explanation for plaintiff's termination—namely, insubordination, which courts in this circuit routinely recognize as a legitimate reason to fire an employee. *See, e.g.*, *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("An employer does not violate [§ 1981] when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise.").

In response, plaintiff asserts that this explanation is a mere pretext for discrimination. Under § 1981, "a plaintiff must initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Although "plaintiff is required to do more than cite to [her] mistreatment and ask the court to conclude that it must have been related to [her] race [or gender]," *Barounis v. N.Y.C. Police Dep't*, 2012 WL 6194190, at *6 (S.D.N.Y. Dec. 12, 2012) (quoting *Lizardo v. Denny's Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)), plaintiff need not show that defendant's stated reason played no role whatsoever in the decision-making process. Rather, plaintiff may survive summary judgment by adducing evidence from which a reasonable jury could conclude that defendant's proffered justification was pretextual and that race was a but-for cause of the decision to terminate her employment. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

Plaintiff points to several facts that, in her view, support a finding of pretext. These include the absence of documentation substantiating any alleged financial loss from the River Hospital incident, the lack of any written policy memorializing the purported approval requirement, evidence that at least certain white male employees received progressive discipline

rather than termination following significant financial or contractual errors, the failure to provide plaintiff with corrective discipline before terminating her employment, and disputes regarding whether plaintiff's conduct constituted insubordination or an exercise of professional judgment. *See* Pl.'s Br., Dkt. No. 63-17 at 26–27. Plaintiff does not appear to dispute that she negotiated and executed the amendment without obtaining advance approval. She maintains, however, that renegotiating provider agreements fell within her ordinary responsibilities and that the June 2022 directive was either never communicated to her or was not presented as an absolute prohibition. *See* Pl.'s Resp. ¶ 98; Pl.'s Dep. Day 1 at 24.

Defendant resists this conclusion by pointing to Ryan Donahue, a white male employee who reported to VP Nichols and who was terminated after extending a contract that he was not authorized to extend. *See* Pl.'s Facts ¶¶ 123–25; Nichols Dep. (Def.'s Excerpts), Dkt. No. 60-10 at 21–24. According to defendants, Donahue's termination demonstrates that plaintiff was not singled out for discipline because of her race or sex, as a white male employee who engaged in comparable conduct likewise lost his employment. *See* Def.'s Mem. at 44–45.

This comparison has some force, and a jury may ultimately credit it. Although Donahue occupied a lower-level position and was not employed as a contract director, his termination tends to undermine plaintiff's assertion that defendant uniformly treated white male employees more leniently than plaintiff following contracting-related errors. At summary judgment, however, it does not resolve the claim. Where each side offers comparators pointing in opposite directions, the competing inferences are for a jury to weigh, not the Court on a paper record. *See* *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Graham*, 230 F.3d at 39.

Viewed in the light most favorable to plaintiff, the non-movant, genuine disputes of material fact preclude summary judgment on plaintiff's discrimination claim.  At summary judgment, the Court is tasked with "examin[ing] the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e); *see also Tex. Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) (distinguishing between burdens imposed by *McDonnell Douglas* and the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated").

Defendant insists that plaintiff cannot show pretext because she violated a clear directive prohibiting mid-term reimbursement increases absent prior approval from Vitagliano.  This directive, however, was not memorialized, and plaintiff testified that she did not recall Vitagliano communicating an "absolute prohibition" on such increases.  *See* Pl.'s Resp. ¶ 98.  And, in any event, plaintiff need not definitively show that defendant's proffered explanation is false to satisfy her third-stage *McDonnell Douglas* burden.  Rather, she must adduce evidence from which a reasonable jury could find that the proffered reason was pretextual and that race was a but-for cause of her termination.  *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("A plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally furnishing a justification known to be false.").

The timing of plaintiff's termination also bears on the third step of the *McDonnell Douglas* inquiry.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  Although the precise chronology of plaintiff's complaints is not entirely clear from the record, plaintiff testified that she met with VP Nichols on June 14, 2022, to complain about Brown's

conduct, including her belief that Brown treated plaintiff differently from the white male directors within the department. *See* Pl.'s Resp. ¶ 65; Pl.'s Dep. Day 2 (Pl.'s Excerpts) at 6–19. Plaintiff's employment was terminated approximately one month later, on July 19, 2022. *See* Pl.'s Resp. ¶ 108. A reasonable jury could certainly consider the proximity between those events, together with the disputed evidence concerning the June 2022 directive and defendant's differential treatment of alleged comparator employees, in determining whether defendant's stated reason for plaintiff's termination was merely pretextual.

To be sure, the record suggests that Robinson and Nickerson, both of whom are white, also expressed concerns regarding Brown's conduct *vis-à-vis* themselves. *See, e.g.*, Pl.'s Resp. ¶ 45. Indeed, most of the complaints raised to management appear to have concerned Robinson's and Nickerson's interactions with Brown. *Id.* ¶ 46. Robinson also suggested that Brown "beats up on" Dan Kane, a white male employee. *Id.* ¶ 47. These facts may weigh against an inference that Brown's behavior was racially motivated. At this stage, however, the relevant inquiry is whether the record as a whole would permit a reasonable jury to conclude that discriminatory animus nevertheless played a but-for role in the decision to terminate plaintiff's employment. *See, e.g., Cronin*, 46 F.3d at 204 ("[T]he function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'").

Ultimately, plaintiff may well have been terminated solely because she violated an important business directive. And of course, § 1981 is "not an invitation for courts to 'sit as a super-personnel department that reexamines' employers' judgments," *Ya-Chen Chen v. City*

*Univ. of N.Y.*, 805 F.3d 59, 73 (2d Cir. 2015) (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014)) or to determine whether plaintiff exercised poor judgment.

Rather, the Court must determine whether the present record permits only one conclusion regarding defendant's motives. On this record, the Court cannot conclude as a matter of law that defendant's stated reason for plaintiff's termination was conclusively unrelated to discriminatory animus. Those and other relevant fact disputes are properly resolved by a factfinder. *See, e.g., Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[The Court] may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.").[7]

### 2. NYSHRL Gender Discrimination

Under the NYSHRL, it is unlawful for "an employer . . . because of an individual's . . . gender identity or expression . . .  to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1).

Here, plaintiff repeatedly compares her treatment to that of "white male" employees and maintains that those employees received more lenient treatment following workplace mistakes. *See, e.g.*, Pl.'s Facts ¶¶ 38–40, 74–78. The record therefore permits an inference that plaintiff perceived both race and gender to be relevant to the differential treatment she experienced.

At the same time, however, much of the evidence concerning Brown's conduct and plaintiff's complaints centers more directly on possible race-based mistreatment. *See* Robinson Meeting (describing Brown's behavior as "possibly 'race related with [plaintiff]'"); *Rodriguez v.*

---

[7] Plaintiff's NYSHRL disparate treatment claim for racial discrimination benefits from a slightly more plaintiff-friendly "motivating factor" causation standard. *See Kittle v. Mavis Discount Tire, Inc.*, 2025 WL 2721620, at \*5 (E.D.N.Y. Sept. 24, 2025). Accordingly, her NYSHRL claim survives for substantially the same reasons as her § 1981 race discrimination claim. *See Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 252, 258–59 (S.D.N.Y. 2024).

*Excellus BlueCross BlueShield, Inc.*, 2024 WL 196747, at *101 (N.D.N.Y. Jan. 17, 2024) (Suddaby, J.) (observing that "there are fewer allegations in the [c]omplaint that regard gender than there are that regard race").

Ultimately, however, the Court declines to parse too finely at summary judgment whether race, sex, both, or neither motivated defendant's conduct. Plaintiff consistently identifies the allegedly more favorably treated employees as "white male" coworkers, and the record, viewed in the light most favorable to plaintiff, could permit a reasonable jury to conclude that plaintiff's identity as a woman—or as a black woman—informed defendant's treatment of her. *See Gorzynski*, 596 F.3d at 110 ("[W]here two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components."). Under the NYSHRL's motivating-factor standard, the present record is sufficient to permit plaintiff's gender discrimination claim to proceed alongside her race discrimination claim. *See Kittle*, 2025 WL 2721620, at *5.

### B.    Plaintiff's Retaliation Claims

Defendant has also moved for summary judgment on plaintiff's retaliation claims under § 1981 and the NYSHRL. Briefly stated, plaintiff claims that defendant retaliated against her after she raised concerns about Brown's behavior. Put differently, plaintiff has alleged retaliation in response to protected activity.

Section 1981 prohibits not only racial discrimination but also retaliation for engaging in protected activity. *See CBOCS West Inc. v. Humphries*, 553 U.S. 442 (2008). The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee

because she "has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(7).[8]

At summary judgment, plaintiff's retaliation claims are subject to the same *McDonnell Douglas* burden-shifting framework as her discrimination claims.  *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  The initial burden is on the plaintiff to establish a *prima facie* case of retaliation by showing: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute*, 420 F.3d at 173).

"As before, the burden of proof at this stage is "'*de minimis* . . . but it is not non-existent."  *Krul v. DeJoy*, 705 F. Supp. 3d 5, 59 (N.D.N.Y. 2023) (Hurd, J.) (quoting *Ringel v. N.Y.C. Dep't of Educ.*, 616 F. Supp. 3d 205, 233 (E.D.N.Y. 2022)).  Once plaintiff has established her prima facie case, defendant must provide a "legitimate, non-retaliatory reason for the allegedly retaliatory action."  *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 178 (2d Cir. 2023) (citing *Ya-Chen Chen*, 805 F.3d at 70).  If defendant satisfies that burden, the presumption of retaliation dissipates, and the burden shifts back to plaintiff to adduce evidence from which a reasonable jury could conclude that the proffered reason was pretextual and that retaliation was the but-for cause of the challenged employment action.  *See id.*; *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 845–46 (2d Cir. 2013).

---

[8]  With respect to plaintiff's NYSHRL retaliation claim, "while courts have not yet clearly defined the scope of the newly amended NYSHRL, they have generally agreed that the new retaliation standard is 'more liberal' than the federal standard."  *Kittle*, 2025 WL 2721620, at *11 (quoting *Menos v. Uncle Nearest, Inc.*, 2025 WL 917347, at *16 (E.D.N.Y. Mar. 25, 2025)).  Accordingly, a retaliation claim that survives under the federal standard will ordinarily survive under the NYSHRL as well.

As discussed *supra*, plaintiff obviously suffered an adverse employment action when her employment was terminated.  Even so, defendant first argues that plaintiff cannot make out a *prima facie* retaliation claim with respect to her termination because she did not engage in any "protected activity" during her employment.  *See* Def.'s Br., Dkt. No. 60-16 at 35–37.

To establish that she engaged in protected activity, a plaintiff must show that she "opposed any practice made unlawful by [§ 1981]" or "made a charge, testified, assisted, or participated in" any proceeding or investigation conducted pursuant to the statute.  *See Littlejohn*, 795 F.3d at 315 (cleaned up).  Importantly, the conduct about which plaintiff complained need not have actually violated § 1981 to satisfy this element of the retaliation claim, rather, a plaintiff need only have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).  And, "[i]n addition to protecting the filing of formal charges of discrimination, [§ 1981] protects as well informal protests of discriminatory employment practices, including making complaints to management, . . .  protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

The parties sharply dispute whether plaintiff's complaints merely concerned workplace conflict or whether they communicated concerns about differential treatment based on race.  As an initial matter, the Court notes that the record is somewhat messy and does not always present a clear distinction between complaints made directly by plaintiff to leadership and those made by Robinson or other members of plaintiff's team regarding Brown's conduct.  Although some of the more explicit references to possible racial bias appear to have been articulated by Robinson

rather than clearly raised by plaintiff, all of the various complaints at issue concerned Brown's mistreatment of plaintiff and were raised in the context of collective and ongoing discussions involving plaintiff, Robinson, human resources personnel, and management.

Section 1981 protects informal complaints to management regarding discriminatory treatment, including complaints raised collectively or with the participation of other employees. *See Sumner*, 899 F.2d at 209 (Title VII and § 1981 protect "as well informal protests of discriminatory employment practices, including making complaints to management"); *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 46 (2d Cir. 2025) (characterizing "complaints to human resources" as protected activities); *see also Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989) ("Congress sought to protect a wide range of activity in addition to the filing of a formal complaint."). Accordingly, the fact that certain concerns regarding race-based treatment were voiced by Robinson rather than plaintiff herself does not, standing alone, foreclose a finding that plaintiff engaged in protected activity where the complaints concerned plaintiff's treatment and plaintiff participated in the related discussions with management and human resources.

Defendant further argues that plaintiff did not engage in protected activity because her complaints regarding Brown amounted to generalized workplace grievances untethered to race discrimination. *See* Def.'s Mem. at 35–38. Plaintiff, by contrast, points to evidence that she and Robinson expressed concern that Brown treated plaintiff and other employees of color differently from white coworkers and that those concerns were communicated to management and human resources personnel. *See, e.g.*, Nichols Dep. (Pl.'s Excerpts), Dkt. No. 63-4 ("Nichols Dep.") at 36–37 (describing a May 2022 email from Wallenhorst to DeFonde discussing Robinson's

complaint about Brown and mentioning "racism undertones perceived by [plaintiff] as stated by her in the past and by [Robinson].").

According to defendant, plaintiff principally complained that Brown was "rude," "dismissive," and "bullying," and admitted that many of her concerns were raised on behalf of Robinson and Nickerson rather than herself. As plaintiff admitted at her deposition:

Q: At any time during your employment with Excellus, did you make a complaint about discrimination?

A: Not during my employment, no.

Def.'s Mem. at 29; *See* Pl.'s Dep. Day 2 (Def.'s Excerpts) at 9.

To be sure, generalized or ambiguous employment complaints do not amount to protected activity. *See Johnson v. City Univ. of N.Y.*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) ("[I]t is objectively unreasonable to believe that complaining about poor treatment in the workplace entirely unrelated to any trait, protected or otherwise, is a 'protected activity' under [§ 1981]."); *Bowens-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (noting that employee's complaint "cannot be so vague or generalized that the employer could not reasonably have understood that the plaintiff's complaint was directed at conduct prohibited by [§ 1981].") (internal quotations omitted).

Nevertheless, viewing the record in the light most favorable to plaintiff, a reasonable jury could conclude that defendant understood, or reasonably could have understood, that plaintiff's concerns implicated race. For instance, plaintiff raised concerns regarding Brown's conduct to VP Nichols, and human resources subsequently became involved following those complaints. Robinson thereafter expressly raised the possibility that Brown's conduct toward plaintiff was "race related" during discussions with VP Nichols. *See* Robinson Meeting.

- 27 -

Although Robinson qualified those statements and acknowledged that she lacked direct evidence of discriminatory intent, the contemporaneous notes from the May 2022 meeting reflect that concerns regarding possible race-based treatment were nevertheless communicated to management. *See, e.g.*, DeFonde Dep. at 22 (recalling that "[Vitagliano] . . . has had conversations with [Wallenhorst] around [plaintiff's] performance concerns but obviously there are some concerns addressing potential racism."). Wallenhorst, too, testified that ethics personnel became involved because concerns regarding possible discrimination had been raised. *See* Wallenhorst Dep. at 9 ("Any[] time complaints around discrimination occur, we pull in ethics.").

Defendant is correct that plaintiff did not *initially* frame her concerns in explicitly racial terms, and much of the conduct at issue could reasonably be interpreted as ordinary workplace conflict. But the relevant inquiry is not whether plaintiff conclusively established discrimination when the complaints were first made. Rather, the question is whether defendant "understood, or could reasonably have understood," that plaintiff's complaints were directed at conduct prohibited by the anti-discrimination law. *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 108–09 (2d Cir. 2011).

Here, the evidence concerning protected activity is equivocal and at least some of the record concerns generalized workplace conflict rather than explicit allegations of racial discrimination. That said, the Court cannot conclude as a matter of law that defendant could not reasonably have understood the complaints to implicate concerns regarding race-based treatment.

"If a plaintiff sustains the initial burden, a presumption of retaliation arises." *Jute*, 420 F.3d at 173. The burden then shifts to the defendant to "articulate a legitimate, non-retaliatory

reason for the adverse employment action." *Id.*  After an employer offers evidence of a legitimate, permissible reason for its action, "the presumption of retaliation dissipates." *Id.*

As relevant here, "[p]roof of causation can be established either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence . . . or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  In the retaliation context, "temporal proximity plays an important role in establishing indirect evidence of . . . retaliatory animus." *Krul*, 705 F. Supp. 3d at 63 (citing *Gorzynski*, 596 F.3d at 110).

Courts within this circuit have recognized that a lapse of only several weeks or a few months between protected activity and an adverse employment action may support an inference of causation.  *See, e.g., Gorzynski*, 596 F.3d 93, 110–11 (finding a span of five months "not too long" to support causal connection); *Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 308 (W.D.N.Y. 2014) (collecting cases and observing that similar timelines fall within the range recognized by the Second Circuit as sufficient to support causation).

The temporal proximity between plaintiff's complaints regarding Brown and the decision to terminate her employment further supports plaintiff's retaliation claim at this stage of the proceedings.  The record reflects that plaintiff's and Robinson's complaints regarding Brown's allegedly race-based conduct intensified during the spring of 2022, human resources personnel participated in subsequent meetings concerning those complaints, and defendant terminated plaintiff approximately one month after the June 2022 meetings addressing those concerns.

Defendant argues that the River Hospital incident was an intervening event that broke any chain of causation between plaintiff's earlier protected activity and her termination.  *See*

Def.'s Mem. at 39–40.  It is true that intervening misconduct may, in some circumstances, sever the causal connection as a matter of law.  *See, e.g., Pompey-Howard v. N.Y. State Educ. Dep't,* 275 F. Supp. 3d 356, 368 (N.D.N.Y. 2017) (Kahn, J.); *Mendez-Nouel v. Gucci Am., Inc.*, 2012 WL 5451189, at *13 (S.D.N.Y. Nov. 8, 2012), *aff'd*, 542 F. App'x 12 (2d Cir. 2013) (summary order).

Here, however, the parties sharply dispute both the scope of the June 2022 directive and whether plaintiff's conduct violated the directive defendant describes.  Under these circumstances, the Court cannot conclude as a matter of law that the River Hospital incident constituted the type of undisputed intervening misconduct sufficient to sever any inference of causation.  *Cf. Lampros v. Banco do Brasil, S.A.*, 2012 WL 6021091, at *11 (S.D.N.Y. Dec. 4, 2012), *aff'd*, 538 F. App'x 113 (2d Cir. 2013) (summary order) ("[T]he *undisputed* existence of a material intervening event severely diminishes any inference that may be suggested by this temporal proximity.") (emphasis added).  Accordingly, viewing the record in the light most favorable to plaintiff, a reasonable jury could conclude that the temporal proximity between plaintiff's protected activity and her termination supports an inference of causation at this stage.

For the reasons discussed above, defendant has carried its burden as to the existence of a legitimate, non-retaliatory reason for plaintiff's termination.  The burden now shifts back to plaintiff to prove that "the desire to retaliate was the but-for cause of the challenged employment action."  *Carr*, 76 F.4th at 178 (quoting *Ya-Chen Chen*, 805 F.3d at 70); *see also Zann Kwan*, 737 F.3d at 846  ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From

such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.").

To be sure, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847. Here, however, the timing evidence does not stand alone. Rather, it coincides with disputed evidence regarding the June 2022 directive and plaintiff's contention that other employees received more lenient treatment following workplace errors.

In particular, the parties dispute whether the June 2022 directive clearly prohibited plaintiff's conduct and whether defendant later exaggerated the seriousness of the River Hospital incident. Under these circumstances, a reasonable jury could conclude that defendant's stated justification was pretextual. *See Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 562 (S.D.N.Y. 2010) (pretext may be inferred where employer "exaggerated the seriousness of the conduct that allegedly justified the adverse action").

Taken as a whole, the record contains sufficient evidence from which a reasonable jury could conclude that retaliatory animus was a but-for cause of plaintiff's termination. That conclusion is not foreclosed by the River Hospital incident given the disputed evidence concerning the June 2022 directive and the characterization of plaintiff's conduct. *See Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 665 (E.D.N.Y. 2015) ("There is a need for caution about granting summary judgment to an employer in a discrimination case where the merits of the case turn on a dispute as to the employer's intent."); *Zann Kwan*, 737 F.3d at 846 n.5 ("The determination of whether retaliation was a 'but-for' cause . . . is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than

a determination that there is no genuine dispute as to any material fact."). Accordingly, plaintiff's retaliation claims remain for trial.

## V.    CONCLUSION

The record reflects a workplace dispute marked by conflicting accounts and disputed motives. At this stage, the Court cannot—and may not—determine which version of events is correct. Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that defendant terminated plaintiff for discriminatory or retaliatory reasons. Accordingly, summary judgment is inappropriate.

Therefore, it is

**ORDERED** that

1. Defendant's motion for summary judgment (Dkt. No. 60) is DENIED;

2. Plaintiff's § 1981 race discrimination and retaliation claims REMAIN for trial;

3. Plaintiff's NYSHRL gender discrimination claim REMAINS for trial;

4. Within thirty days of the date of this Decision and Order, counsel shall file a Joint Status Report indicating the parties status of settlement and provide the Court with dates that the parties can begin trial. A pretrial scheduling conference will be set at that time.

The Clerk of the Court is directed to terminate the pending motion.

**IT IS SO ORDERED.**

Dated:  July 22, 2026
         Utica, New York.

Anthony J. Brindisi
U.S. District Judge